IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| JAMES S. BURROUGHS, | ) | Civil Action No. 3:11-1862–CMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court pursuant to Local Civil Rule 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for DIB on March 24, 2004, alleging disability as of September 1, 2003. Tr. 96. Plaintiff's claim was denied initially and upon reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on December 6, 2005, at which Plaintiff and a vocational expert ("VE") appeared and testified. On October 24, 2006, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled because he was able to perform his past relevant work as a security guard. On September 15, 2008, the Appeals Council remanded the case for further review. Tr. 50-52.

A hearing was held by a different ALJ on February 12, 2009, at which Plaintiff appeared and testified. On November 6, 2009, the ALJ issued a decision denying benefits and finding that Plaintiff

was not disabled. The ALJ, after hearing the testimony of a VE, concluded that work exists in the national economy which Plaintiff could perform.

Plaintiff was forty-two years old at the time of the ALJ's decision. He has a tenth grade education and previously drove trucks, worked as a security guard, recalibrated electric meters and ran a drop plow for a telephone company. Tr. 101-108, 505, 541, 553. Plaintiff alleges disability due to chronic obstructive pulmonary disease ("COPD"), degenerative disc disease of his lumbar spine and cervical spine, and degenerative joint disease of his left shoulder. See Tr. 21, 507.

The ALJ found (Tr. 21-31):

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2008.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of September 1, 2003 through his date last insured of December 31, 2008 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: chronic obstructive pulmonary disease, degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, and degenerative joint disease of the left shoulder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a significant range of light work as defined in 20 CFR 404.1567(b). Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour day. The claimant can no more than occasionally push or pull, balance, stoop, bend, kneel, crouch, and crawl; he must avoid ladders, scaffolds, ropes, temperature extremes, humidity, and vibrations; and cannot perform work requiring exposure to fumes, odors, gasses, airborne irritants, hazard, unprotected heights, or moving machinery. Such a residual functional capacity is well supported by the weight of the evidence of record.

6. As a result of his residual functional capacity as described above, through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January 9, 1967, and was 41 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date[ ] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 1, 2003, the alleged onset date, through December 31, 2008, the date last insured (20 CFR 404.1520(g)).

The Appeals Council denied Plaintiff's request for review on June 21, 2011. Tr. 9-12.

Accordingly, the ALJ's decision became the final decision of the Commissioner. Plaintiff filed this action in the United States District Court on July 29, 2011.

**STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

**MEDICAL EVIDENCE**

Plaintiff was seen at the Williamsburg Regional Hospital on October 16, 2001, for complaints of left knee pain and swelling. X-rays revealed no acute bony injury. Tr. 157.

On March 11, 2002, an MRI of Plaintiff's cervical spine revealed mild reversal of the normal cervical lordosis along with disc space narrowing and small posterior osteophyte at C5-6. Tr. 187. Blood tests revealed elevated cholesterol levels. Tr. 186. On August 9, 2002, an MRI of Plaintiff's lower back revealed a large diffuse disc bulge at L5-S1. Tr. 196.

On August 22, 2002, Plaintiff was seen by Dr. William Edwards of Pee Dee Orthopaedic Associates for complaints of back and leg pain. Examination revealed normal motor strength of the lower extremities, limited flexion of his back, and positive straight-leg raises. Dr. Edwards assessed a herniated disc at L4-5 with lumbar radiculopathy. Dr. Edwards noted that if Plaintiff's symptoms did not improve with epidural steroid injections and exercise, surgical treatment would be offered. Plaintiff was prescribed Ultram for pain. Tr. 603-604.

Plaintiff was seen on January 16, 2003 by Dr. Arthur Wilkoszewski for complaints of fever and chest pain. Dr. Wikoszewski diagnosed pharyngitis and referred Plaintiff to a cardiologist. Tr. 205. On that same day, Dr. James L. Dedonis of Advanced Cardiology Consultants noted that Plaintiff had hypertension, dyslipidermia, family history of coronary disease, and a history of smoking. An EKG demonstrated sinus rhythm that appeared to be within normal limits. Dr. Dedonis

referred Plaintiff for cardiac stress testing. Tr. 200. Blood testing revealed elevated cholesterol levels. Tr. 182.

On January 22, 2003, a stress test was negative for ischemia or infarction and revealed lower normal myocardial function. An echocardiogram revealed mild cardiomegaly with preserved systolic function, normal cardiac valve morphology and function, and no pericardial effusion. Tr. 198-199.

On April 21, 2003, Dr. Wilkoszewski referred Plaintiff to a gastroenterologist for treatment of gastroesophageal reflux disease ("GERD"). Tr. 206. On April 24, 2003, Dr. Palmer Kilpatrick from Pee Dee Gastroenterology wrote that Plaintiff had a three year history of heartburn and postprandial regurgitation. He diagnosed Plaintiff with GERD, advised him to lose weight and avoid large greasy meals, and prescribed an anti-reflux medication. Tr. 210-211.

On September 29, 2003, Plaintiff complained to Dr. Wilkoszewski about neck pain and right arm weakness. X-rays showed disc space narrowing and a small anterior osteophyte at C5-6. Tr. 181. On October 6, 2003, Plaintiff complained to Dr. Wikoszewski about neck and back pain. Dr. Wikoszewski wrote that Plaintiff should be on light duty until he could be seen by an orthopedic physician. Tr. 208-209.

Plaintiff returned to Dr. Edwards on October 16, 2003, for evaluation of his complaints of neck and back pain. Examination revealed normal strength in Plaintiff's upper extremities, marked limitation of flexibility, normal reflexes, and tenderness in Plaintiff's lower back. Tr. 601. An MRI revealed a disc protrusion at C5-6 with foraminal narrowing and some degenerative changes. Dr. Edwards recommended an epidural steroidal injection and opined that surgical intervention should be considered as a last resort. Tr. 217, 602.

On December 8, 2003, Dr. Edwards noted that Plaintiff continued to have significant radicular pain, more on the right than the left, and was not responsive to epidural steroid injection. Plaintiff stated that he wished to proceed with surgery. Tr. 602. On December 31, 2003, Plaintiff underwent C5-6 cervical diskectomy and fusion surgery. Tr. 218. Dr. Edwards noted in follow-up appointments in February, March, and April 2004, that Plaintiff had done well, his radicular pain had resolved, he had minimal decreased range of motion of the neck, and he had some ongoing low back problems. Dr. Edwards released Plaintiff in April 2006 to activities as tolerated. Tr. 599-600.

On June 15, 2004, Plaintiff saw Dr. Regina Roman for a consultative orthopaedic examination. Plaintiff reported low back pain and radicular symptoms in the left upper extremity, but denied any pain in his neck. Examination revealed full range of motion of his neck; full range of motion of his shoulders, elbows, wrists, knees, hips, and ankles; positive straight leg raises; an antalgic gait; and no evidence of muscular atrophy. Tr. 222-225.

On July 1, 2004, Dr. George Keller, a state agency physician, reviewed Plaintiff's records and completed a Residual Functional Capacity ("RFC") Assessment form. Dr. Keller opined that Plaintiff was capable of performing the exertional requirements of light work with postural limitations of only occasional climbing, stooping, kneeling, crouching, and crawling. Tr. 329-336.

Plaintiff saw Dr. Wilkoszewski on August 12, 2004 for complaints of back and neck pain with headache. Plaintiff reported that he was still suffering from pain after surgery and had some weakness of his left arm. Tr. 230. Plaintiff saw Dr. Wilkoszewski again on September 21, 2004 for complaints of pain in his right shoulder. X-rays of Plaintiff's right shoulder were essentially normal, and medication was prescribed for pain. Tr. 179, 229. Plaintiff was referred to Dr. Jafer Gheraibeh, an

orthopaedic surgeon, for his complaints of right shoulder pain. On October 12, 2004, Dr. Gheraibeh assessed degenerative joint disease and referred Plaintiff to physical therapy. Tr. 235.

On October 17, 2004, Dr. Edwards completed a fill-in-the box statement in which he opined that Plaintiff could only lift and carry ten pounds or less; could stand for about six hours in an eight-hour day; could sit for about six hours in an eight-hour day; needed to rotate sitting and standing; was limited to occasional reaching; was limited in pushing/pulling and reaching; and could never perform postural activities (climbing, balancing, kneeling, crouching, crawling, and stooping). Tr. 238-241.

During a consultative examination with Dr. Gheraibeh on February 3, 2005, Plaintiff reported neck pain radiating into his left upper extremity that was relieved somewhat with medication. Examination revealed normal muscle bulk without atrophy, normal gait, normal grip strength, no sensory loss, positive straight leg raises, normal fine and gross movement of the hands, and reduced flexion of the back. Plaintiff reported he could help his wife with washing dishes and taking care of the house, but could not push a lawnmower. Dr. Gheraibeh diagnosed Plaintiff with status post cervical fusion, C5-6, chronic low back pain (under control), hypertension (under control), and GERD (under control). Tr. 232-233. A cervical spine x-ray the same day revealed cervical fusion surgery with anterior plate and screws at C5-C6 level. Alignment and position in the area appeared good and Plaintiff's cervical spine was noted to be otherwise unremarkable. Tr. 321.

In March 2005, state agency physician Dr. Katrina Doig completed a Residual Functional Capacity Assessment form. She opined that Plaintiff was capable of exceeding the exertional requirements of light work, but his ability to reach was limited. Tr. 337-344.

7

On August 6, 2005, Plaintiff presented to the emergency room in California with complaints of shoulder, neck, back, and head pain following an accident in which the 18-wheeler truck he was riding in overturned. CT scans of Plaintiff's neck and head were negative. He was assessed with neck and shoulder sprain and lower back pain, and was subsequently discharged. Tr. 293-318. Plaintiff followed up with Dr. Cecil Bozard of Pee Dee Orthopaedic on August 11, 2005. Examination revealed tenderness to palpation with significant spasm and limitation of motion about Plaintiff's left shoulder and left anterior ribs, tenderness to palpation of his lumbar spinous processes with limitation of motion, diminished sensation of his left lower extremity, spasm in the upper back, tenderness in his left shoulder, negative (normal) straight leg raises, diminished sensation in his lower extremities, and no motor deficit. Dr. Bozard diagnosed cervical and lumbar strain with left rib contusion. Tr. 197. In August and September 2005, Plaintiff continued to have left shoulder problems, but had less spasm in his upper back. Tr. 292. An MRI of Plaintiff's left shoulder revealed some degenerative changes of his AC joint with some impingement on his supraspinatus tendon. Tr. 292.

On December 1, 2005, Dr. Bozard completed a form in which he opined that Plaintiff did not have a vertebrogenic disorder, did not have significant limitation of motion of the spine, did not have radicular distribution of significant motor loss, did not have radicular distribution of muscle weakness, and did not have radicular distribution of reflex loss, but did have radicular distribution of sensory loss. He further opined Plaintiff's combined impairments were medically equivalent to the Listing of Impairments ("Listings")[1] at § 1.04 (disorders of the spine). Tr. 323-325.

_____

[1]See 20 C.F.R. Pt. 404, Subpt. P., App.1

In February 2006, Dr. Bozard referred Plaintiff to Dr. Patrick Denton (also of Pee Dee Orthopaedic) for evaluation of Plaintiff's left shoulder. Examination revealed normal strength, tenderness at his AC joint, and mildly positive Hawkins impingement sign. Dr. Denton recommended surgery. Tr. 393. In September 2006, Plaintiff underwent left shoulder arthroscopy. Tr. 378. Subsequent to the surgery, Dr. Denton noted Plaintiff was doing well and opined that Plaintiff had a ten percent impairment of his left upper extremity. Tr. 390.

Plaintiff was hospitalized from August 19 to 22, 2006 for pneumonia, hypertension, and chronic back pain. A drug test was positive for marijuana and cocaine. Tr. 369-371.

During October and November 2006, and again in January 2007, Plaintiff complained about low back pain to Dr. Gheraibeh. Tr. 391, 396. Examination in January 2007 revealed no sensory or motor loss, normal deep tendon reflexes, and positive straight leg raises. Tr. 391. An MRI revealed a disc bulge at L4-5 that effaced the thecal sac without central canal stenosis or significant neuroforaminal narrowing. Tr. 402.

In February 2007, Plaintiff began seeing Dr. Albert Mims, for complaints of neck and low back pain. Tr. 595. Dr. Mims noted that Plaintiff's spine showed limited range of motion in his neck with flexion, extension, rotation, and side-to-side flexion with some pain on side-to-side flexion. His shoulder had painful abduction and circumduction, particularly on the right. Tr. 595. On March 28, 2007, Plaintiff complained of pain between his shoulders and low back down into his leg, buttocks, and knee which occurred after he used a weed eater. Dr. Mims prescribed medications and diagnosed acute lumbosacral strain superimposed on degenerative disc disease with left posterior thigh referral. Tr. 596. In notes from a physical therapy evaluation dated April 25, 2007, Plaintiff reported that his pain had become almost unbearable. Tr. 432-434.

Dr. Mims saw Plaintiff on June 13, 2007, for complaints of GERD, internal hemorrhoids, hypertension, and chronic low back pain. Plaintiff stated he went to two weeks of physical therapy, but had problems attending because of the cost of gas and other transportation issues. Dr. Mims prescribed pain medications for Plaintiff and increased the dosage of medication for his depression. Tr. 598. On July 9, 2007, Plaintiff complained of epigastric pain as well as back pain between the shoulder blades and down his lumbar spine. Dr. Mims noted spasm in Plaintiff's scapular costal area bilaterally with pain on forward flexion and rounding of the thoracic spine. He assessed Plaintiff as having epigastric pain - rule out gastritis, back pain, COPD, and depression with anxiety. Tr. 410.

On September 12, 2007, Plaintiff returned to Dr. Mims for a follow-up for hypertension, degenerative disc disease, and osteoarthritis of the C-spine with prior surgery. Cervical spine x-ray reports dated September 12, 2007, were reviewed by Dr. Mims. Tr. 430. Dr. Mims continued to see Plaintiff for various complaints in April, July, and September 2008. Tr. 414- 416.

A November 4, 2008 cervical MRI revealed a moderate bulge at C3-4 without central canal stenosis or nerve root impingement, a small disc herniation at C4-5 without cord impingement or nerve root impingement, a bony outgrowth at C5-6 without cord or nerve root impingement, and a bulge at C6-7 with possible nerve root impingement. Tr. 425-426. After reviewing the MRI, Dr. Mims referred Plaintiff to Dr. William Naso, for evaluation of neck and arm pain. Tr. 583-585.

On December 18, 2008, Plaintiff underwent C6-7 diskectomy and fusion. Tr. 580-582. At a follow-up appointment with Dr. Naso on January 15, 2009, Plaintiff reported he felt much better and he was not having any radicular pain. Tr. 579. Dr. Denton assessed Plaintiff with left shoulder rotator cuff tendinitis and recommended an injection on January 19, 2009. Tr. 404-405.

In a letter dated February 3, 2009 (more than a month after Plaintiff's last date insured), Dr. Mims opined that Plaintiff's condition equaled the Listing at § 1.04(A)(C) as of Plaintiff's alleged onset date (September 1, 2003) to the present. Dr. Mims opined that Plaintiff continued to have significant problems with any exertional activities as well as problems with attention and concentration to task most likely due to his chronic pain and depression. He further opined that Plaintiff was limited to sitting less than two hours a day as well as limited to standing less than two hours a day. Dr. Mims also stated that Plaintiff should be limited to standing less than two hours out of an eight hour workday, sitting less than two hours a day out of an eight hour workday, lifting less than ten pounds, and needed daily rest periods in a reclined position of a minimum of an hour in the mornings and afternoons (due to chronic pain). Tr. 406-407.

In a letter dated February 4, 2009, Dr. Denton wrote that Plaintiff's shoulder looked good radiographically. Dr. Denton noted that Plaintiff had a touch of tendinitis, opined that it should resolve with conservative treatment, and administered a subacromial injection to see if it would provide relief. Tr. 403.

On March 19, 2009, Plaintiff reported to Dr. Mims that he had an increase in back pain (with pain going down his legs to some degree). Tr. 441. Plaintiff returned to Dr. Mims on May 11, 2009, with new symptoms of left lower extremity weakness and numbness with bilateral numbness and discomfort of his fourth and fifth fingers. He had decreased sensation to light touch and vibration of his fourth and fifth digits. Dr. Mims prescribed medications and noted that Plaintiff had bilateral C8 radicular symptoms and left posterior knee numbness. Tr. 443. On May 13, 2009, an MRI revealed evidence of a prior anterior fusion with plate and screw fixation at C6/C7 with minimal flattening of the spinal cord, but normal cord signal; evidence of C5/C6 previous diskectomy and fusion with

mild attenuation of the thecal sac with minimal inferior exiting foraminal encroachment by bony proliferative changes; and a large paramedian broad base disc protrusion attenuating the thecal sac, but no cord compression at C4/C5. Tr. 454-455.

An x-ray of Plaintiff's right shoulder taken at Williamsburg Regional Hospital on May 25, 2009, revealed no evidence of joint dislocation or displaced fracture. Moderate hypertrophic AC joint changes were noted. Tr. 453.

Dr. Mims saw Plaintiff on May 26, 2009, after Plaintiff hit his right shoulder during a fall while on a boat ride. Plaintiff reported he went to the emergency room for an x-ray. The x-ray was negative for fracture or dislocation. Dr. Mims noted that it was painful for Plaintiff to move his shoulder, particularly when he tried to abduct it over 90 degrees. Tr. 444. On May 27, 2009, an MRI of Plaintiff's right shoulder revealed diffuse edema and defect in the posteolateral humerus most compatible with an acute Hill-Sachs deformity, likely reflecting recent anterior dislocation; thickening of the anterior labrum without definite tearing but with at least a component of fraying; moderate to large joint effusion; and superimposed moderate to severe tendinopathy involving the distal supraspinatus and infraspinatus tendon. The MRI also indicated minimal hypertrophic degenerative changes at the right AC joint and fraying of the superior labrum. Tr. 451-452.

## HEARING TESTIMONY

At the December 6, 2005 hearing, Plaintiff testified that he could not work due to the pain in his lower back and in his shoulder. Tr. 510-511. He stated he had a burning and numbness sensation down his left leg with pain almost every day since September of 2003, and used a TENS unit at home. Tr. 511-512. Plaintiff stated he was having spasms in his neck, headaches, pain in his shoulders and arms, and numbness in several fingers on his left hand just about every day. Tr. 513.

Plaintiff testified that his hypertension and medication caused him to become light headed and a "bit disoriented." Tr. 516. Plaintiff testified that walking the three steps up to his house was difficult for him and he could only sit for ten to fifteen minutes before having to get up and move around. Tr. 518. Plaintiff further stated he gets in a fetal position with a pillow between his legs or in his recliner two to three hours per day. Tr. 519. He reported problems lifting due to pain in his shoulders, and stated he could not bend, crouch, crawl, kneel, or stoop without pain. Tr. 520. Plaintiff stated that he had to use a cane in 2003, but was not using a cane at the hearing because the problem with his left leg "comes and goes." Tr. 520. Plaintiff testified that he sometimes dropped things, his fingers cramped up on him, and he had trouble dressing because of pain. Tr. 521-522. Plaintiff reported that he sometimes helped his wife by washing dishes and cooking. He stated that he was unable to sweep, vacuum, fold clothes, make beds, or do yard work. Tr. 523-524.

At the 2009 hearing, Plaintiff testified that the main problems that kept him from working were his neck and shoulder. He stated that he had spasms in his neck, could not turn his head, and had weakness in his hands. Tr. 557. Plaintiff testified that he had problems with his lower back including weakness and tingling in his left leg, and pain in his lower back and both hips. Tr. 559. He testified that he mostly took Tylenol and Motrin for his pain. Tr. 558, 560.

Plaintiff estimated that he could stand or walk for about twenty to thirty minutes before taking a break and sitting, and could sit for twenty to thirty minutes before he needed to get up and move around. Tr. 565, 507. He testified that he tried not to lift anything over ten or twenty pounds because of his back. Tr. 568. Plaintiff stated he cooked simple things, washed dishes, and went to church. Tr. 570-571.

## DISCUSSION

Plaintiff alleges that: (1) the ALJ erred in failing to give the opinions of his treating physicians controlling weight; and (2) the RFC found by the ALJ is not supported by substantial evidence. The Commissioner contends that substantial evidence[2] supports the Commissioner's final decision that Plaintiff was not disabled within the meaning of the Social Security Act.

### A. Treating Physicians

Plaintiff argues that the ALJ erred in failing to give the opinions of his treating physicians (Dr. Edwards, Dr. Bozard, and Dr. Mims) controlling weight where they were well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record. Specifically, he argues that these opinions are entitled to controlling weight because Dr. Edwards treated him beginning in 2002 and operated on his cervical spine in 2003; Dr. Bozard made findings of tenderness of his low back, limitations of motion, diminished sensation of his left lower extremity, and significant spasm and limitation of motion of his left shoulder; and Dr. Mims began treating him in 2007 and noted continuing problems with his neck and low back. Plaintiff also argues that these opinions are supported by the entire record including the consultative examination of Dr. Roman in which she noted that Plaintiff had an antalgic gait and positive straight leg raising and opined that his chronic low back problems appeared

---

[2]Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

to preclude heavy lifting; Dr. Denton's opinion that he had a ten percent permanent impairment as a result of shoulder pain; and the consultative examination by Dr. Gheraibeh who noted that straight leg raise testing was positive and that he reported numbness in his fingers and increased pain with holding up his arm or lifting. Additionally, Plaintiff argues that these opinions are by MRIs which revealed significant problems and the fact that he had to undergo two cervical spine surgeries and a shoulder surgery. The Commissioner contends that the ALJ reasonably determined that these opinions were not entitled to controlling weight because they were not supported by the treatment notes of these practitioners and are not supported by the weight of the evidence. Additionally, the Commissioner argues that the ALJ's decision to discount these opinions is supported by the findings of the consultative physicians and the opinions of the state agency physicians. The Commissioner also contends that statements asserting Plaintiff met the Listing at § 1.04 are not entitled to controlling weight as they are opinions on an issue reserved to the Commissioner.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ's decision to discount the opinion of treating physicians Edwards, Bozard, and Mims is supported by substantial evidence and correct under controlling law. The ALJ specifically discounted Dr. Edwards' opinion because the weight of the evidence indicated that Plaintiff generally had full range of spinal motion with no muscle loss and weakness, was able to engage in a wide range of activities of daily living, and improved following surgery. Tr. 26.

In June 2004, Dr. Roman noted that Plaintiff had full range of motion of his cervical spine; full range of motion of his shoulders, hips, and ankles; near normal extension of his lumbar spine; normal lateral flexion of his lumbar spine; and no muscle atrophy. Tr. 223-224, 226. Dr. Edwards noted that Plaintiff recovered well from cervical spine surgery and only had some mild mechanical symptoms and minimal decreased range of motion in April 2004. Tr. 599. There is no indication that Dr. Edwards assessed any functional limitations following surgery. See Tr. 599-600.

As noted by the ALJ (Tr. 25-26), Plaintiff testified at the February 2009 hearing that he could cook simple meals, wash dishes, attend church services, and drive short distances; he testified at the December 2005 hearing that he could drive twice daily, attend church and Mason meetings, visit with

16

friends, grocery shop, occasionally go out to eat, and occasionally attend sporting events.  The ALJ also noted (Tr. 26) that Plaintiff reported at a June 2004 consultative examination that he was able to perform all of his activities of daily living, drive a car, wash some dishes, and perform some yard work, and reported at a December 29, 2004 appointment that he did a lot of barbequing over the weekend (Tr. 177).  Additionally, the ALJ noted (Tr. 26) that following Plaintiff's alleged onset date he reported to a medical provider in October 2004 that he drove a truck (Tr. 235), treatment notes indicated that Plaintiff injured his shoulder while in a truck in California in 2005 (Tr. 393 ), he reported in June 2006 that he had been a truck driver for the last few years (Tr. 386), and he reported in January 2007 that he sometimes helped his brother in construction (Tr. 391).

The ALJ specifically discounted  Dr. Mims' opinion because it was generally unsupported by the weight of the evidence of record, the medical records indicated that Plaintiff's dysfunction responded well to treatment including surgery, and the opinion was not supported by Plaintiff's activities of daily living.  Dr. Mims' opinion is not supported by Plaintiff's activities of daily living, as discussed above.  As noted above, Plaintiff's impairments improved following cervical and shoulder surgeries. Dr. Gheraibeh found that Plaintiff had normal muscle bulk without atrophy, normal gait, and no sensory loss. Tr. 233. Although Dr. Roman noted that Plaintiff's gait was antalgic and slow, she found only that his condition precluded "heavy" lifting.  Dr. Roman also found that Plaintiff had full range of cervical spine motion and no muscle atrophy.  Tr. 222-225.  Dr. Mims noted that Plaintiff had no loss of strength.  Tr. 596.

The ALJ's decision to discount the opinions of Drs. Bozard and Mims that Plaintiff met the Listing at § 1.04[3] is also supported by substantial evidence. As noted by the ALJ (Tr. 26-27), Dr. Bozard did not find that Plaintiff had any significant limitations in his spinal range of motion or appropriate radicular distribution of significant motor loss or weakness. It was also noted that the evidence of record failed to show the requirements of this Listing. The ALJ found that Plaintiff did not meet or equal the Listings at § 1.00 and wrote that the weight of the evidence failed to indicate that Plaintiff suffered from the elements required under § 1.04.[4] See Tr. 23. Although Dr. Bozard

---

[3]The Listing at § 1.04 provides:
Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

    A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
    or
    B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
    or
    C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.

[4]"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 404.1525(d); see Bowen v. Yuckert, 482 U.S. 137, 146 and n. 5 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to

(continued...)

indicated that Plaintiff suffered from sensory loss (Tr. 325), he did not find that Plaintiff suffered the required limitation of motion of his spine or motor loss (see Tr. 324) as required by §1.04A. There is no indication that Plaintiff had Spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication to meet the Listings at § 1.04B or C. There is no indication that Dr. Mims found that Plaintiff had the motor loss required under § 1.04A or the inability to ambulate effectively required under § 1.04C. Further, as noted by the Commissioner, such an opinion is on an issue reserved to the Commissioner and is thus not entitled to any special weight or significance. See 20 C.F.R. § 404.1527; Castellano v. Secretary of Health and Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994).

B.  RFC

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence. He argues that he has significant disc problems with radiculopathy in his cervical and lumbar spine, as well as shoulder problems, which prevented his performance of the full range of light work after his alleged onset date (September 1, 2003). He appears to argue this based on his testimony at the hearings.[5] Plaintiff argues that Dr. Edwards' opinion supports his assertion that he

---

[4](...continued)
furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A claimant has to establish that there was a "twelve-month period...during which all of the criteria in the Listing of Impairments [were] met." DeLorme v. Sullivan, 924 F.2d 841, 847 (9th Cir. 1991)(finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

[5]It is unclear whether Plaintiff is attempting to assert that the ALJ erred in evaluating his credibility. In assessing credibility and complaints of pain, the ALJ must: (1) determine whether
(continued...)

is not able to stand for six hours a day or lift twenty pounds. In particular, Plaintiff argues that the ALJ's finding that he had the full range of spinal motion with no muscle loss or weakness is erroneous because he continued to have limitation of motion in his spine. The Commissioner contends that the ALJ's RFC determination is supported by substantial evidence including the opinions of the state agency physicians who both determined that Plaintiff could perform the exertional requirements of light work, the evidence of record, and evidence that Plaintiff's neck and shoulder conditions improved after surgery.

The ALJ's RFC assessment should be based on all the relevant evidence. <u>See</u> 20 C.F.R. § 404.1545(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative

---

[5](...continued)

there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. <u>See</u> <u>Craig v. Chater</u>, 76 F.3d 585, 591-92 (4th Cir. 1996); <u>Mickles v. Shalala</u>, 29 F.3d 918 (4th Cir. 1994). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

Here, the ALJ's decision to discount Plaintiff's credibility is supported by substantial evidence and correct under controlling law. As discussed above, the objective medical evidence supports the ALJ's determination that Plaintiff did not suffer from disabling symptoms. The ALJ's credibility assessment was also supported by Plaintiff's reported activities of daily living as discussed above. <u>See</u> <u>Mastro v. Apfel</u>, 270 F.3d at 179 (claimant's daily activities undermined her subjective complaints). The ALJ noted (Tr. 25) that Plaintiff had significant periods of time since his alleged onset date during which he did not take any prescription pain medication. <u>See</u>, <u>e.g.</u>, <u>Shively v. Heckler</u>, 739 F.2d 987, 990 (4th Cir. 1984) (expressing approval of ALJ's consideration of a plaintiff's lack of strong pain medication); <u>see also</u> 20 C.F.R. § 404.1529(c)(3)(listing "other evidence" to be considered when "determining the extent to which [claimant's] symptoms limit [claimant's] capacity for work," including, "(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms[.]").

discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis...." SSR 96-8p. The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. Id.

The ALJ's determination that Plaintiff had the RFC to perform a significant range of light work is supported by substantial evidence and correct under controlling law. A narrative discussion of Plaintiff's impairments and their impact on Plaintiff's ability to work was included in the ALJ's decision. See Tr. 28-30. Plaintiff appears to argue that the ALJ should have found Plaintiff had further limitations based on the opinions of his treating physicians. As discussed above, however, the ALJ reasonably discounted those opinions. The ALJ's decision is supported by the consultative examinations of Drs. Roman and Gheraibeh which revealed that Plaintiff had full range of motion of his neck, no muscle atrophy, full range of motion of the joints of his lower extremities, normal muscle bulk, normal grip strength, and normal fine and gross movement of his hands. Tr. 224, 233. The medical record also indicates that Plaintiff's neck and shoulder conditions improved after surgery. Tr. 390, 579, 599-600. The ALJ's decision is also supported by the opinions of the state agency physicians who found that Plaintiff could perform a range of light work. See 20 C.F.R. §§ 404.1527 and 416.927; SSR 96-6p ("Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review.").

## **CONCLUSION**

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be

**AFFIRMED**.

Joseph R. McCrorey
United States Magistrate Judge

October 18, 2012
Columbia, South Carolina